**Pages 1 - 77**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge Presiding

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
|  VS. | )  **NO. CR 18-00465 MMC** |
| | ) |
| FUJIAN JINHUA INTEGRATED | ) |
| CIRCUIT CO., LTD., | ) |
| | ) |
|    Defendant. | ) |
| _____ | ) |

San Francisco, California
Wednesday, August 16, 2023


<u>**TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**</u>


<u>**APPEARANCES BY ZOOM WEBINAR**</u>:

For Plaintiff:
     ISMAIL RAMSEY
     Acting United States Attorney
     450 Golden Gate Avenue
     San Francisco, California  94102
   **BY:  LAURA VARTAIN HORN**
     **NICHOLAS WALSH**
     **ASSISTANT UNITED STATES ATTORNEYS**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Stenographically Reported by:
Kelly Shainline, CSR No. 13476, RPR, CRR
Official Reporter

1    **APPEARANCES**:  **(CONTINUED)**

2

     For Plaintiff:
3

4                          U.S. DEPARTMENT OF JUSTICE
                           National Security Division
5                          950 Pennsylvania Avenue, N.W.
                           Washington, D.C.  20530
6                 **BY:  STEPHEN MARZEN**
                       **TRIAL ATTORNEY**
7

8    For Defendant:
                           SKADDEN, ARPS, SLATE, MEAGHER & FLOM
9                          525 University Avenue, Suite 1100
                           Palo Alto, California  94301
10                **BY:  JACK P. DICANIO, ESQ.**
                       **EMILY A. REITMEIER, ESQ.**
11
                           SKADDEN, ARPS, SLATE, MEAGHER
12                            & FLOM LLP
                           300 South Grand Avenue
13                         Los Angeles, California  90071
                  **BY:  MATTHEW E. SLOAN, ESQ.**
14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>**Wednesday - August 16, 2023**</u>                    <u>**10:00 a.m.**</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Calling Criminal Case Number 18-465, |
| 5 | United States of America versus Fujian Jinhua Integrated |
| 6 | Circuit. |
| 7 | Will counsel please state your appearances for the record, |
| 8 | starting with government counsel. |
| 9 | **ATTORNEY VARTAIN:**  Good morning, Your Honor.  Laura |
| 10 | Vartain, Nicholas Walsh, and Steve Marzen for the |
| 11 | United States. |
| 12 | **THE COURT:**  Good morning. |
| 13 | **ATTORNEY DiCANIO:**  Good morning, Your Honor.  Jack |
| 14 | DiCanio, Max Sloan, and Emily Reitmeier for Jinhua. |
| 15 | **THE COURT:**  Thank you.  Good morning and here we are |
| 16 | again.  Okay. |
| 17 | Well, we have several things on the calendar and I might |
| 18 | just pick one out at random to start with.  I don't know which |
| 19 | one is shorter really. |
| 20 | I have the briefing on all of the motions, which I |
| 21 | appreciate, and also on some things that are not designated |
| 22 | formally as motions but have come up as matters that I |
| 23 | expressed interest in. |
| 24 | Let's do remote testimony.  Perhaps that's where we start. |
| 25 | **ATTORNEY DiCANIO:**  Your Honor, before you begin, can I |

1    just give a brief update on that?

2         **THE COURT:**  Yes.  I didn't expect you had one.  Thank

3    you.

4         **ATTORNEY DiCANIO:**  I did just about an hour ago.

5    Your Honor, our request would be that the Court take that

6    particular motion off calendar.  We believe we are going to

7    hear from the MOJ, and it is our belief that it's going to be a

8    positive response.

9    Now, Your Honor, it is not official.  We haven't got

10   official word yet, and so with all of the appropriate caveats,

11   I do think it probably would be most productive if we hold off

12   on that, wait to finally hear from the MOJ, and hopefully we

13   won't have an issue.  But that would be my suggestion.

14        **THE COURT:**  Okay.  Well, I learned a lot about the law

15   of remote testimony, which may come in handy in the future if I

16   don't need it now.

17   All right.  I assume you don't have an objection to that,

18   Ms. Vartain, or anyone else for the government.

19        **ATTORNEY VARTAIN:**  I'd like to know when we're going

20   to hear from the MOJ.

21        **THE COURT:**  Well, that would be one question, although

22   I think that the defendant wouldn't have any real reason to

23   want to drag their feet too much on this since they're going to

24   want to know if they have to make arrangements one way or the

25   other, depending on my ruling, what they're going to do about

it.

So, Mr. DiCanio, what's your estimate on all of this since you just heard about it, frankly?

**ATTORNEY DiCANIO:** Yeah, you know, Your Honor, I don't have a kind of definitive estimate other than to say to the Court that we're obviously pushing very hard to hear this week. Because you're right, Your Honor, arrangements have to be made.

And if you remember, Your Honor, one time when this came up, now several months ago, there was a process that they have to go to to get a special passport that relates to their nonpersonal travel so there is some process that we have to go through. So we are pushing very, very hard to hear that this week. My expectation is that would hear it by -- certainly by the beginning of the trial or the reboot of the trial, but I don't have anything definite to offer.

**THE COURT:** Well, I think it's better to wait because, again, I haven't asked you, Mr. DiCanio, who you heard from and what you've heard specifically. And frankly I'm a little concerned about jinxing anything by going into the details, though if it's necessary for ruling, I might have to.

My thought here is that every development has some bearing on the record of what the Court is considering in making a decision on this particular call. So I don't want it to languish, but my thought is that as you keep hearing, you keep giving updates, and we're going get to a point where everybody

1    has to prepare.

2        If I grant the motion for remote testimony, for example,

3    everybody has to prepare and gear up for examining those

4    witnesses both on direct and cross.  And if I said, no, they

5    have to be here, and if they aren't here they're not

6    testifying, and everybody can put that away.

7        In fact, I have no idea what the backdrop is for

8    Mr. Marzen today.  He has a wall of binders and boxes of some

9    sort.  I have no idea if that is supposed to be this trial and

10   intimidating, or just moved from his attractive home

11   surroundings for some other reason.

12       But in any event, my thought is to grant the request to

13   take it off without prejudice to simply renoticing or refiling

14   with more info if needed.  All right.

15               **ATTORNEY DiCANIO:**  Thank you, Your Honor.

16               **ATTORNEY VARTAIN:**  Your Honor, I hear the Court's

17   ruling on that, but I would add that the government's request

18   is that by the end of the witnesses who are testifying remotely

19   starting next week, we have to have an answer, and if we don't,

20   the defense should rest.

21       And that's because this case has been sitting on ice for

22   the long period, the Court knows, and also because the

23   government's rebuttal case is prepared to go forward, if

24   necessary, and the one witness who we know is traveling is the

25   witness who's going to be on a plane from Taiwan at the end of

1   next week, and this is the window that she is available to us.

2   And so I would like to put her on at that point in time, but I

3   would also not put her on until I know what the Court's ruling

4   on Jeff You and Wu Junsheng is because purportedly the facts

5   that they're going to proffer are relevant to their expert and

6   also then to our expert.

7       So I'm happy to put it, you know, sort of have the Court

8   hold it in abeyance, but I think that the end of that period

9   should be when the second of the two fact witnesses next week

10  is done testifying.

11      **THE COURT:**  Well, definitely at the beginning of our

12  trial with -- we're starting with remote witnesses, I gather,

13  even if the two witnesses that are currently in limbo turn out

14  to be available.  It isn't like you're expecting they'd be able

15  to get here at the start of the trial; is that right,

16  Mr. DiCanio?

17      **ATTORNEY DiCANIO:**  Yes, Your Honor.  We would start

18  with the -- really the three -- the two remote witnesses, and

19  obviously depending upon your ruling on our professor, the

20  three remote witnesses.

21      **THE COURT:**  And then the government's concern, if you

22  didn't get to call the professor, I think they weren't going to

23  call their expert.  But I could be wrong.  They're not

24  necessarily precluded from doing it.  But, okay, I thought that

25  might have been their thought.  But it doesn't matter.

1          I will ask for a report and update at no later than the

2     start, and anything that we know in between I think needs to be

3     shared with the Court and opposing counsel in whatever format

4     you feel is most appropriate, Mr. DiCanio, but still that we

5     know that.

6          And then at the start if I haven't heard anything, I'm

7     going to be asking what's going on, and this motion may just

8     pop back on again.

9          But what would be odd is if I rule, all right, they could

10    testify -- maybe I say they could testify remotely -- I don't

11    know, I have to hear everybody on it before I make a ruling --

12    then it turns, oh, wait, maybe we could have them.  What does

13    the government want to do?

14         Because at the very early part, the government, while

15    objecting to remote testimony, chose remote over having to wait

16    an extended period.  Of course, what sounded like an extended

17    period then turned out to be a short period.  And what we've

18    really gotten into is an extraordinarily extended period.

19         So, again, if you're thinking we're going to hear, we're

20    going to hear, we really have to hear.  It can't be it's coming

21    any moment now.  We're going to hear something.

22         Everyone wants to get this done.  I know you do too.  All

23    right.

24              **ATTORNEY DiCANIO:**  Thank you, Your Honor.

25              **THE COURT:**  Okay.  But that's about the best I'm going

1    to do.  I hadn't expected any kind of update, frankly.  I

2    thought we had gone into some, you know, period of silence and

3    that it was going to be remote or nothing.

4        Okay.  Well, let's then go to the government's -- I'm

5    sorry -- well, the government's objection to the motion to

6    exclude the expert.  I'm well aware of the concerns that

7    originally arose as to whose law we were going to apply.  And I

8    was rather pleased to see that everybody is on the same page as

9    to whose law controls.  Law as law; all right?  The question is

10   whether we have in this instance an offer of law as a fact.

11       Well, that was interesting.  Out of nowhere Mr. DiCanio

12   disappeared and Ms. Reitmeier showed up labeling with --

13   labeled with everybody.  I guess you're all somewhere nearby.

14   Okay.  That was kind of interesting.  I didn't know you could

15   do that with Zoom.  And apparently you didn't, you just moved

16   over.

17       Anyway, so that's really the question here, whether or not

18   this witness can add anything on the issue of what this

19   contract document means.

20       Essentially the defendant's position is the thing is a

21   sham.  It isn't an employment contract.  Without putting a

22   totally pejorative name on it, it's not intended, according to

23   them, to be what it looks like.  And everybody has cases that

24   says just because you call a horse a cow doesn't make it a cow.

25   So you can call somebody an agent, but they're really not,

1    they're an independent contractor or vice versa.

2         So if you have a contract, it'll be interesting to see

3    what's said here about intent.  Some idiosyncratic unilateral

4    intent won't change necessarily the meaning of a contract.  But

5    if everybody intends, for example, that this not to be what it

6    is, then that would be different.

7         Also -- and I'm just talking about contract creating

8    agency, not whether somebody has some other appointment of an

9    agent independent of a written document.  I don't know that

10   that's actually being argued here in any way.  But it might be,

11   and that would be separate from the contract question.

12        But of course I don't think we're going to have Mr. Ho,

13   for example, who is the signatory on the one -- the contract

14   that we do have, the one work contract.  But both sides can

15   argue whatever inferences they may be able to argue can be

16   drawn from whatever evidence we do have as to what he intended,

17   et cetera.

18        So, all right.  So the point that I gather is that this

19   witness would say, all right, in China if you were going to

20   have a true employee/employer relationship, you need to get a

21   permit and you've got to get some other things signed, and what

22   have you, and they didn't get it.

23        Of course she can't testify as to what someone's intent

24   is.  She can just testify as to facts that one can then argue,

25   based on that support, whatever somebody's intent might have

1    been.

2         Now, I don't know that you really need her from the

3    defense except perhaps as a corroborative witness.  If -- well,

4    again, I'm not positive if you need one of the people that,

5    I'll just call them are in limbo at the moment, or whether you

6    can get the testimony from the people who have been designated

7    as approved remote witnesses.

8         Although Ms. Vartain, et al., would like me to reconsider

9    that and I might, okay.  I mean it's kind of crossed my mind.

10   The pandemic is easing.  Although it's on the surge again,

11   frankly so I don't know.

12        But leaving that aside, if they testify or somebody

13   testified on behalf of the defendant, one, we didn't intend

14   this, neither did UMC, neither did Mr. Ho who's part of it.  We

15   were all in cahoots that we would write it this way so somebody

16   got some advantage somehow somewhere.

17        Okay.  Then -- and they could say, I'm assuming, that they

18   understand, having employed people in the past, that when you

19   have to employ someone, we went and we got permit, what have

20   you.  Okay.

21        But they're not necessarily experts on the law.  And so

22   somebody, if they were able to testify as an expert on the law,

23   would not just say it's a practice, it's required, what have

24   you.  So they might add a bit, but they wouldn't be the first

25   witness on the subject, as far as I understand it.  But it

1    didn't sound like, other than just being cumulative possibly,

2    that it wouldn't be a relevant fact.

3        So that's where I'm kind of coming from here.  Not that

4    she can tell me what law to apply, but to tell me what

5    ordinarily happens.  It can be a law.  It can be a practice

6    under a law.  It can be custom, whatever, about what people do

7    when they really want to make somebody an employee.

8        So that's just kind of how I saw it.  Not terribly

9    complicated.  But so I'm leaning toward allowing her to

10   testify, and I want to give the government a chance to add

11   anything.  They made rather, you know, complete arguments in

12   opposition, but if there's anything you want to stress or add,

13   I should hear that certainly.

14       I don't think there's any question this is someone we

15   don't necessarily want to put on a plane.  She had the lung

16   surgery and all.  And of the three, she has the best

17   credentials to be too sick to fly kind of idea.

18       Okay.  Ms. Vartain, or anyone, if you want to designate

19   anybody else here.

20       All right.  Mr. Marzen.  It looks like you got a haircut

21   on top of everything.  Okay.

22           **ATTORNEY MARZEN:**  That's precisely what Ms. Vartain

23   said.

24           **THE COURT:**  That's pretty funny.  Okay, go ahead.

25           **ATTORNEY MARZEN:**  So, Your Honor, we think about the

1    issue the same way that you do, but we take it one step

2    further.  And this is the way we look at it.

3        So Jinhua has conceded, you know, after briefing, that

4    U.S. agency law and U.S. respondeat superior law applies.

5    That's a momentous development.  But as you'll also remember,

6    that was the focus of our entire brief.

7        So now Jinhua has a new brief and they say that, well,

8    actually even though PRC law isn't directly relevant, it's kind

9    of indirectly relevant, because as you pointed out, U.S. agency

10   law requires a manifestation of assent.  And they say, well,

11   assent is kind of like intent and Professor Jiang can talk

12   about intent.

13       But just to go back to one point you made, Professor Jiang

14   actually can't say anything about the party's subjective

15   intent.  She's not a percipient witness.

16       So and the other point that you made is maybe she can tell

17   us about how contract law operates and whatnot.  And on this,

18   Your Honor, the best -- and this is the first time we've had a

19   chance, the government, to address, you know, what Jinhua's

20   counsel just put in.  I would very much suggest you take a look

21   at the expert disclosure of Professor Jiang.

22       Because this is one of those witnesses who's different

23   from all the other witnesses.  You don't have to wait for a

24   game time call to know whether something is relevant or not.

25       And the challenge with Jinhua's latest position in their

brief is Professor Jiang doesn't talk about what ordinarily happens in contracts.  She's got a long disclosure and a detailed disclosure so we know what she'll say.

Two-thirds of the disclosure is focused on whether, as a matter of Chinese contract law, this is a labor services agreement or a labor relations agreement.  That's really not relevant anymore because Jinhua has now conceded that U.S. agency law applies and governs here.

The back half of the contract, which is where the money testimony is, is basically telling you that J.T. Ho's contract is a formality, wasn't observed.  But when you read that part of the document, there's nothing about J.T. Ho's contract.

So you think are we going to listen -- are we going to hear about the right-to-control provisions in J.T. Ho's contract.  That's P272 at pages 5 to 6.

Articles 7.1 and 7.2 where there's a right to control, a right to report, a work-for-hire provision that says any of J.T. Ho's inventions belong to the employer Jinhua.

Professor Jiang, read her disclosure, call for the disclosure, doesn't talk about any of his contractual provisions.  Instead she goes on for a page about subordination based on her understanding of what the King and Wood Mallesons' lawyers told her.  In fact, the summary paragraph says in summary Professor Jiang will testify that based on the evidence reported to her, there was no personal organizational or

1    economic subordination between Ho and Jinhua unless they didn't

2    have a labor relationship.

3         Well, as you were pointing out, Your Honor, there was

4    already only a thumbnail that Professor Jiang could testify to.

5    Please, you don't have to make the call now.  You probably want

6    to go back to the chambers and read the disclosure.  But if you

7    look at the disclosure, nothing of what she says in the four

8    corners of disclosure is relevant to any issue left after

9    Jinhua's concession the U.S. agency law applies.

10        And the only thing that's left and the only thing that

11   would be relevant is all outside the disclosure, and we would

12   object to it coming in.

13        **THE COURT:**  Okay.  Before you respond,

14   Ms. Reitmeier --

15        Oh, wait a minute, we're not going to do tag team on the

16   issue though.  So we're going to have like one lawyer on the

17   point.

18        **ATTORNEY MARZEN:**  Yes, I'm sorry.  We just couldn't

19   hear you, Your Honor, because one of our lawyers turned off the

20   speaker.

21        **THE COURT:**  Oh, I thought you said somebody else was

22   going to add to what you'd said, and then I was going to say --

23        **ATTORNEY MARZEN:**  No, I was just asking Ms. Vartain to

24   turn on her speaker because she is our source of your audio.

25        **THE COURT:**  Oh, okay.  All right.

1        **ATTORNEY MARZEN:**  My apologies.

2        **THE COURT:**  She's running the acoustical aspect here.

3   Okay, fine.

4        So, Ms. Reitmeier, before you respond, just to frame it up

5   a little of where he's kind of catching my attention,

6   Mr. Marzen, to lead off with the first issue that I would like

7   to get clear is whether -- is whatever your response is because

8   I don't have the disclosure immediately here -- I don't -- I'll

9   go through it in a minute to look, but whether there's an

10  argument to be made that what she is offered to testify to is

11  beyond the scope of the disclosure.  In other words, a

12  discovery argument.  Okay.

13       Because even if someone had something relevant to add or

14  say, if they hadn't been disclosed fairly to offer that

15  opinion, then that might not be fair coming so late in the

16  game.

17       All right.  So that would be the leadoff issue.  Assuming

18  you get past that, then as I understand a little bit from

19  Mr. Marzen, she had been offered to testify about the language

20  of the contract.  Certainly there's all kinds of language in

21  there if you accept the language that would be indicative under

22  U.S. contract law of what would make someone an agent or an

23  employee as opposed to an independent contractor.  We can

24  control you, you've got to report to us, et cetera, et cetera.

25       But there may be things that she had planned to say that

1    in a traditional employment agreement are missing from this

2    particular document.  In other words, if the document deviates

3    at all from what would be a typical employment agreement, I

4    kind of assumed that it was probably a form that Jinhua used

5    for all their employees even if they mean it to be a real

6    employee.

7        Okay.  So and then the other, as I understand it, not to

8    say that I have to follow the law of the PRC, but rather what

9    people ordinarily do, whether it's legally mandated or not when

10   somebody is hired as an employee.  Sometimes the law requires

11   you do certain things and sometimes people just do them out of

12   practice or custom.

13       So the first question -- and let's see, I think I do have

14   the particular aspect of the expert disclosure.  I was just

15   looking to see where it might be deemed more limited than what

16   you were proposing the professor testify to.

17       So knowing those things, Ms. Reitmeier, you're on at this

18   point.  Okay.

19       **MS. REITMEIER:**  Thank you, Your Honor.

20       I think as just kind of an overarching thought, what the

21   government wants to do is pick up this contract and say there's

22   a labor contract, there's provisions of these labor contracts.

23   Jinhua thus had the right to control J.T. Ho and J.T. Ho was

24   Jinhua's agent.  I think that's the simple way of the evidence

25   that they would like to put in and the inferences they would

1    want to draw.

2         Where the professor comes in is she says this isn't a

3    valid labor contract.  This isn't -- this doesn't give control

4    from Jinhua over the individual because all of these hallmarks

5    were met, which is what you need to have to have control over a

6    relationship.

7         **THE COURT:**  Can I stop you for a minute.  Do you mean

8    hallmarks contained in an employment agreement or something

9    separate and distinct from the agreement itself?

10         **MS. REITMEIER:**  I think it's both contained in the

11    agreement and then the treatment of the individual.  So, for

12    instance, you picked up on work permits.  The agreement says

13    you need to get a work permit.  She will opine that that is

14    something that is necessary to have to have an employment

15    relationship.

16         And then what will come in is the facts from Jinhua who

17    says we never got a work permit; right?  You have to read it as

18    kind of the whole together.

19         Another instance would be if you go through her report,

20    there's certain aspects of the formalities of a relationship,

21    that people get vacation time off, that they have supervisors,

22    they report to management.

23         Again, those are -- whether they're actually in the

24    contract or just kind of these things that surround labor

25    relationships, she will talk about that.

1        And where her conclusion comes in is at the end of the day

2   she says this agreement was not used to create a labor

3   relationship because the actions of Jinhua, based on the facts,

4   are inconsistent with the labor relationship.

5        And so where that leaves us is to your point, the factual

6   point of then Jinhua did not have the ability to control

7   J.T. Ho.  Thus he was not their agent.

8        **THE COURT:**  Okay.  Well, I don't know that she can go

9   quite as far as you said, and you didn't start with what I

10   wanted you to start with, which is whether or not this opinion

11   that she's going to offer is within the disclosure that was

12   made.  So I do need you to go back to that eventually.

13        Where her testimony stops, if she does testify, may be a

14   subject of some discussion.  And also, of course, someone can

15   respond by, okay, you intended to do it and you've done it.

16   Whether or not -- you know, you've made him your agent, whether

17   you were trying to do it -- whether your contract actually

18   spelled out and met every dotted "i" and crossed "t,"

19   everybody understood this was your agent because everyone

20   understood he was going to be working for you in some fashion.

21   And it's up to you and the PRC to fight out whether you did a

22   good job on it or not.  And there's things that each of you can

23   argue.

24        But certainly if somebody -- and I'm assuming your people

25   know they're supposed to get a permit if they are under the

1    law.  They've hired people before.  You want to call people who

2    are head of HR.  If they don't know that, they should get a

3    different job.

4         So under those circumstances, that's why I said some of it

5    may be a bit cumulative.  But again you may be having a

6    layperson saying something about the law and having, you know,

7    an expert, professor of law that would be able to confirm that.

8    That's worth something.

9         Otherwise someone could say, Yeah, what do you know?  It's

10   just, you know, somebody in the business community.  You're not

11   a lawyer.

12        But anyway, so I want to get back.  I understand that she

13   may not be able to say this isn't an agreement.  Okay.  She

14   might be able to say it doesn't meet the ordinary picture of

15   what an agreement looks like, et cetera.  But I'm not sure

16   exactly how far she can go.  It really doesn't matter.  Okay?

17        What she needs to put in if she's going to testify is it

18   doesn't, one, look like what people usually do either on paper

19   or in practice, to sum it up and that's that.

20        Now if that goes beyond what the disclosure is, even if

21   it's relevant she can't do it at this late stage unless I find

22   some reason why she could.

23        So do you want to respond to Mr. Marzen who says, gee, you

24   know, we were so focused on this other idea that you were just

25   trying to apply China law in the U.S. that we didn't make all

1   these arguments we're making now.  Okay.

2           **MS. REITMEIER:**  Sure, Your Honor.  The way I view her

3   disclosure is it has two parts.  The first part of her

4   disclosure is how to determine whether a labor relationship

5   exists under Chinese law.

6       In that part of her disclosure, she goes through what we

7   would call the characteristics or hallmarks of a labor

8   relationship under Chinese law.

9           **THE COURT:**  Okay.  Do you happen to have the

10  disclosure?  Can someone grab it for you?

11          **MS. REITMEIER:**  I do have it.  I have it in front of

12  me right now.

13          **THE COURT:**  You do.  Okay.  So you might want to point

14  me --

15          **MS. REITMEIER:**  Sure.

16          **THE COURT:**  -- to the particular paragraphs that you

17  think covered this so that, you know, everybody could look at

18  it and say yes or no to that description.

19          **MS. REITMEIER:**  Of course, Your Honor.

20      So we start out with her background qualifications and

21  things like that.  On page 2 which is section 4 --

22          **THE COURT:**  Okay.

23          **MS. REITMEIER:**  -- it has a summary of her expert

24  opinion.  And then I'm looking at --

25          **THE COURT:**  Okay.  Let me stop you for a minute.

1    You're going to use the page numbers at the bottom rather than

2    the ECF page numbers; right?

3         **MS. REITMEIER:**  I'm using the page numbers at the

4    bottom.

5         **THE COURT:**  Okay, fine.

6         And section 4 is what you wanted me to look at first?  Or

7    where you're going to say that this covers the idea of what the

8    contract looks like in some fashion?

9         **MS. REITMEIER:**  Yeah.  So the first item that she

10   covers is what are the characteristics of a labor relationship

11   under Chinese law.  And you can see there's actually a heading

12   that says "How to Determine Whether a Labor Relationship Exists

13   Under Chinese Law."

14        **THE COURT:**  Um-hmm.

15        **MS. REITMEIER:**  She goes through over the next few

16   pages, you can see there's subheadings, you know, Subject

17   Qualifications, Actual Employment, Subordination, which covers

18   those features that a relationship needs to have to be

19   considered a labor relationship under Chinese law.

20        I think that's fairly within what she will testify to, and

21   to your point, the characteristics of what you would need to

22   have both as a combination of the contract and of the factual

23   treatment of J.T. Ho.

24        **THE COURT:**  She was saying there were two types kind

25   of relationships.  I was thinking of it more in terms of all or

nothing.  She's actually saying, oh, there's two types.
There's kind of the really tight relationship and the real
looser one.

But if you look at it that way, they can both be
employees.  If they were both employees, then maybe under U.S.
law an employee is an agent, assuming they're not doing
something bizarrely outside of their job duties.  They can do
their job duties illegally and still bind the employer under
certain circumstances.

Of course we can talk about that law when we get to it,
who does what, when, and knows what when, that might be
attributable to a corporate entity or an employer as an
individual.

Okay.  But all right.  So I think that what may be the
differentiating thing here is that her focus is she's saying
this is what the law is, and the inference was I'm going to say
you have to apply this law here in the U.S.  That's kind of how
I think the government maybe understood the argument,
particularly in the context of how the various positions were
being laid out.

But that doesn't mean that her opinions are coming in as a
surprise, just that it may be offered essentially in a
slightly -- on a slightly different point, if you will, the
fact rather than the law as the law -- the law as a fact.

Okay.  It sounds like she is going to talk about what's

1    usually in an agreement and, et cetera.

2         Okay.  And then we can leave her qualifications out for a

3    moment.  She looks to be someone who could say what she wants

4    to say if she's allowed to.

5         Anything else that you wanted to point to along the way

6    then in her opinion other than to say these contracts don't

7    usually have the earmarks of a full-blown employee/employer

8    relationship.

9         **MS. REITMEIER:**  The next thing, Your Honor, is on

10   page 12.

11        **THE COURT:**  Okay.  Let me go up to that.  Don't go

12   yet.  I want to get it in front of me.

13        Oops, I went too far.  Okay.  So I have page 12.

14        **MS. REITMEIER:**  And so page 12 you can see the

15   question that's asked there about two-thirds down the page is:

16   Did Jinhua and J.T. Ho have a labor relationship?

17        And that's the point of her opinion where she takes both

18   the contract that she saw, the background of Chinese labor law,

19   the requirements you have to have.

20        And, you know, as Mr. Marzen pointed out, she was relying

21   on facts provided to her at the time.  We didn't have facts in

22   evidence.  When she testifies at trial, she'll be relying on

23   facts that have been proffered at trial to conclude that Jinhua

24   and J.T. Ho did not have a labor relationship based on the

25   contract and the conduct of the parties.

1      And that's really the opinion that she's giving.

2           **THE COURT:**  Okay.  And the way I would read that is as

3      follows:  Originally she was going to say therefore -- they

4      didn't have one under Chinese law, therefore they don't have

5      one in this case.  All right.

6           Now she would be saying they didn't have one as ordinarily

7      set out under China law and that you can then consider that as

8      a fact along with the other evidence that is going to be put in

9      about what the parties were doing at the time that they created

10     this document.

11          And so -- but I think it sounds -- Mr. Marzen, it sounds

12     like she's going to say the same things.  It's just that the

13     argument that the defendant makes based on that is going to be

14     different.  And the how far she goes after she makes certain

15     statements would be again a limitation rather than an

16     expansion.

17          So I think that it's still within the confines.  In other

18     words, she was going to give a broader opinion than she may be

19     allowed to give, not a different or bigger opinion than she

20     originally stated, is the way I'm looking at it.  I'll let you

21     go back to that, Mr. Marzen, and then I'll have to make some

22     kind of ruling on this.

23          **ATTORNEY MARZEN:**  Understood.

24          Just two quick thoughts.  And I do agree with

25     Ms. Reitmeier about the division of the opinion.  I think we

1  both read it.

2      From pages 1 through 12, she's talking about the factors

3  because she's a code lawyer, unlike a common law lawyer.  So

4  for a code lawyer, the first and most important thing when you

5  get a contract question is what kind of contract is it.

6  Because then you go to the code section and figure out where it

7  slots in, and then consequences follow based on what kind of

8  contract it is under the code.

9      So it's very important for her, as Ms. Reitmeier starts

10 out in the summary, to define is this a labor relationship,

11 quote/unquote, or a labor service relationship, because that

12 matters to her.

13          **THE COURT:**  I don't know that it matters to us.

14          **ATTORNEY MARZEN:**  Of course it doesn't matter to us.

15          **THE COURT:**  It may not.

16          **ATTORNEY MARZEN:**  I'm sorry, I can't hear you.

17          **THE COURT:**  Oh, okay.  It may not matter to us.  I had

18 actually thought about it as employee/nonemployee.  Now it

19 turns out there's employee A, there's employee B, there's not

20 employee.  Okay.

21          **ATTORNEY MARZEN:**  Right.  And for us, of course, even

22 that doesn't matter because as long as you're an agent, you

23 have the imputation.

24          **THE COURT:**  Hmm.  If.  If you're an agent.  Okay.

25          **ATTORNEY MARZEN:**  Yes.

1          **THE COURT:**  So they have to have some kind of

2     relationship that can fit within the definition of an agent

3     before they could be responsible for Mr. Ho or anybody.  Any

4     principal can be held responsible for the actions of someone

5     else if we're dealing with it.

6          Oftentimes it's very easy so you have a -- typical in a

7     civil case, you have an employer.  An employee does something

8     wrong within the scope of their duty.  They run a red light in

9     their bus and hit somebody.  Whatever.

10         It's, you know, then they -- if they start getting really

11    far afield, a teacher who molests a kid in the bathroom, is

12    that part of their job.  All right.  The Safeway checker that

13    gets into a beef with a customer and punches him out.  That

14    might be part of their job if you read some of these cases.  So

15    it's a little bit of what can you expect of your employee idea.

16         If you don't have an employee and you have nothing else on

17    paper that's making you someone who has a relationship with

18    another person, they have to start talking about what went on

19    between them.

20         Here we have something that went on and then it's going to

21    be a question what was it?  What do these people think they

22    were doing at this time?  And we don't have Mr. Ho.  So

23    everybody is going to have to be saying what he could have been

24    thinking was going on.

25         He's not an expert in China law.  He's from Taiwan.  Even

1    if he were someone who was from the PRC, he might not know what

2    the law was.  So maybe he thought he had a good contract.  You

3    can't just -- if somebody wants to enforce a contract, you

4    can't say, oh, I thought it meant something entirely different

5    than it said.

6         So the defendant will have their work cut out on this

7    because not all the players have been here in this case.  There

8    are many important people who were just offshore, so to speak.

9         So we'll wait and see.  But I'm going to deem it

10   submitted, and I am going to grant the motion to let her

11   testify.  And then any objections that want to be made as to

12   the scope, if I don't weigh in automatically, feel free to

13   object at that time.

14        But I think that there are things that she can say that

15   may bear on what was, for lack of a better word, going on when

16   they got involved with this contract.

17        **ATTORNEY MARZEN:**  Thank you, Your Honor.

18        **THE COURT:**  Okay.  Thank you.

19        So then I'm not going to find -- by the way, I'm not going

20   to find she's totally cumulative and useless in that regard.  I

21   think she can add something that only perhaps an expert can.

22        Then let's go back for a moment, if we want to go back.

23   Well, actually, what Ms. -- I think it was -- I'm not sure if

24   that paper was authored by Ms. Vartain or not, but what the

25   government was saying is, Judge, if you're going to let these

1    other people testify remotely, we'll end up with the entire

2    defense case remote, and we think you ought to reconsider that

3    some of these people really aren't that sick and they ought to

4    come here.

5        Okay.  Now I haven't said that they could testify

6    remotely, and they may not be even offered to testify remotely.

7    They may actually show up.  So we haven't gotten to the let's

8    all reconsider the semi-sick people.

9        But I don't know if anybody really wants to push that now

10    or to wait.

11        Ms. Vartain, what's your thought on that?  You're muted.

12        **ATTORNEY VARTAIN:**  It's hard for me to resist the

13    Court's invitation to at least dangle a couple ideas in front

14    of the Court.

15        **THE COURT:**  Dangle away.

16        **ATTORNEY VARTAIN:**  Okay.  So we've got two witnesses

17    who we expect to testify beginning Monday morning, Chairman Lu

18    Wensheng and Albert Wu.  With respect to Chairman Lu Wensheng,

19    I was reviewing or rereviewing his declarations.

20        The Court may recall that the primary reason he was

21    unavailable was that the Fujian Electronics Information Group,

22    FEIG, who is Jinhua's largest shareholder, wouldn't let him

23    travel because he's too important.

24        **THE COURT:**  Just one second.

25                        (Sneezing.)

1          **ATTORNEY VARTAIN:**  Bless you, Your Honor.

2          **THE COURT:**  Thank you.  One sec.  I don't know what

3   got in my throat.

4      Okay.  Just say that last part again about the provincial

5   people weren't going to let him travel.

6          **ATTORNEY VARTAIN:**  Yes, because he's too important.

7          **THE COURT:**  Oh, yeah.

8          **ATTORNEY VARTAIN:**  He runs the show, 200 subsidiary

9   companies, et cetera, et cetera.

10     However, the reason he was going to have to be gone for so

11  long and off of his duties and not signing things in ink at the

12  time was because COVID travel was burdensome and lengthy.

13     I don't believe that's the case these days.  And so he

14  could come in.  And he could leave in an expedited fashion

15  certainly as compared to when his declaration was proffered in

16  April of 2022.  And so I think he should be here.

17     He had proffered some more minor health problems in

18  addition that under ordinary circumstances I don't believe the

19  Court would have held to be in and of themselves a reason that

20  he couldn't travel.  And certainly now that COVID is not in the

21  situation it was in April of 2022 should not be a reason.

22  So --

23         **THE COURT:**  Okay.  So that's one.  And I will let

24  Mr. DiCanio respond.

25     I don't want to mix up who has what health condition.  So

1   I do want to get that cleared up along with whatever else we're
2   talking about.
3        Okay.  Do you want to go to the second person, or do you
4   want to stay with him then?
5        **ATTORNEY VARTAIN:**  I'll move to Albert Wu, Your Honor.
6   Albert Wu is the second fact witness that we expect to testify.
7   And Mr. DiCanio can correct me if I misunderstand things, but
8   at least last time we were scheduled, Lu Wensheng would go
9   first and Albert Wu would follow him.
10       **THE COURT:**  Okay.
11       **ATTORNEY VARTAIN:**  Albert Wu was -- I don't know what
12  his current title was -- is, but at the time he was the VP of
13  operations.  And by "at the time," I mean 2016-2017.
14       **THE COURT:**  Right.
15       **ATTORNEY VARTAIN:**  And he proffered some health
16  conditions that made him uncomfortable traveling.  In addition,
17  at least at the outset, he had -- he was unable to travel due
18  to the travel restrictions in the specific area that he lived
19  in.  Those presumably travel restrictions have lifted.  His
20  health conditions were not in the category of what I would say
21  the professor's were.
22       He has in fact traveled here to the United States in the
23  past.  He was here in 2016 for the CASPA meeting.  And he
24  should come back again and testify live in court, Your Honor.
25       So with the Court's invitation, I am renewing our

1    objections and asking the Court to look again at the record and

2    see if these two witnesses can in fact testify in person.

3        **THE COURT:** Even if they could, I think it may take

4    some time to get them here, which then creates some problems.

5    Though I understand your position because we are dealing with

6    what is the state of affairs at the time of the trial.

7        Ordinarily we don't have people so far away. When you

8    were talking about remote witnesses in your opposition to the

9    motion to allow the two other people to testify remotely. And

10   most of the time these people are in the U.S., they're not in

11   other countries, et cetera, et cetera. We just have a lot of

12   stumbling blocks here.

13       Mr. DiCanio, do you have these people in mind, which Wu

14   and which Yu and we're talking about here, for who's got what

15   condition and what their problems are?

16       **ATTORNEY DiCANIO:** Yeah, I do, Your Honor. What I

17   would say is that, if you recall, the reason the Court allowed

18   the remote testimony was based upon the proven medical

19   conditions of both individuals --

20       **THE COURT:** Yes.

21       **ATTORNEY DiCANIO:** -- and they had a doctor evaluation

22   as well.

23       I would say, Your Honor, that a long time has passed since

24   we paused the trial. And so I would say that if this was

25   something that the government wanted to bring up, that is

1    something they should have brought up a long time ago.  Because

2    we would be faced with a situation, if you were to change your

3    ruling on that, we'd have to go back to the MOJ and we'd have

4    to start the process all over again for those gentlemen to get

5    permission to travel to the United States.

6        However, unlike the two that we are talking about this

7    morning coming to the United States, they have real medical

8    issues.

9        And so Ms. Vartain, who has been pushing, pushing to try

10   to get this back on track, this seems like a maneuver that

11   would not do that, that would delay things even longer.

12   Because it's being raised now, we'd have to go through a whole

13   application process.

14       So, Your Honor, respectfully I would suggest that I don't

15   believe that there is really good cause to revisit that

16   decision at this point.

17       And I would also say, Your Honor, that the suggestion that

18   somehow Jinhua is advantaged by this is really kind of a gross

19   mischaracterization of how I feel about this.

20       These are gentlemen that are going to be testifying in the

21   middle of the night, at 1:00, 2:00, 3:00 o'clock in the

22   morning.  That is not optimal from a defense lawyer's

23   perspective as to how to present your evidence.

24       So, Your Honor, for that in mind, I would hope that the

25   Judge -- Your Honor would not revisit because I think that

1    would put us in -- boy, it would put us in a whole lot of a

2    difficult situation in terms of getting approval and the

3    timing.

4        But I think the MOJ, in my view, is backtracking on a

5    decision of the Court when we're so close, I think, to getting

6    the witnesses that could come here.

7        **THE COURT:**  Well, I'm certainly not going to make that

8    decision right now.  And I understood it was more or less

9    contingent, but I could go back and look at how it was raised.

10       But, Mr. DiCanio, could you just say, if you remember,

11   which of your witnesses has what health condition and which of

12   the other one has whatever his health condition?  I know

13   there's a heart condition that one of them has.  Or at least --

14       **ATTORNEY DiCANIO:**  Your Honor, as I sit here today, I

15   don't recall.  We could certainly pull up the medical records

16   and remind the Court before the end of the hearing.

17       I know that there was a heart issue.  I know that there

18   were respiratory issues.  But as I sit here today, I'm getting

19   them confused as to which relates to which one.

20       **THE COURT:**  Okay.  I tend to mix people up some which

21   is -- some of these people have really similar names, but they

22   probably don't sound that similar if you're in China.  But with

23   the subtle differences in intonation, but when you try to write

24   them out transliteratively here, it just doesn't really make a

25   major distinction.  So I don't recall them as being as, let's

1    say, dramatic a condition as your expert had with the lung

2    cancer.

3        But I will say that these variants seem to be coming to

4    the fore in the pandemic.  I will tell you that we just got

5    word that the Northern District probation officers, federal

6    probation officers, I believe, had a conference in which a

7    really large number have come down with COVID.  And they wanted

8    to let the Court know so that we could understand that they may

9    not be present for certain sentencings or other criminal

10   proceedings that they ordinarily would be asked to be present

11   for.

12       I just came back a couple weeks ago from the Ninth Circuit

13   Judicial Conference, and at least two of my colleagues came

14   down with COVID right after that.  It's out there.  Both of

15   them have had it before.  They've been boosted.  You'd think

16   their immunity was pretty good.

17       So I think there is a risk if one does have a health

18   condition.  And I don't really want to second-guess if at least

19   facially the representation is that someone either has a --

20   well, has some form of health condition that might make them,

21   one, more susceptible, and, two, more likely to have more

22   serious side effects.  Because it is true that many people are

23   not that sick anymore, but still I don't know if I'm wanting to

24   run the risk.

25       Let me see.  Let me just look here for a minute.

1    Albert Wu, he apparently has -- you know, he has
2    tachycardia and hypertension.  Hypertension is high blood
3    pressure.  Tachycardia is that your heart is not really beating
4    the way it should be.  That sometimes can be monitored with
5    various types of implants.  I do not know at the moment just
6    how serious or what's being done to control that.

7    Lu Wensheng, I think is the one with the pulmonary
8    condition.  So you may just want to gear up with those and
9    possibly follow up with those witnesses to see how they're
10    doing and if necessary even get an update from a medical
11    practitioner just to make that point stronger if we're still
12    relying on health.

13    I'm less impressed with, hey, we don't want to let you go
14    because it's inconvenient for us as a country.  You know,
15    that's -- it does -- as an individual, he's kind of stuck.  But
16    in the same light, it does seem like, you know, we don't want
17    people bossing us around here.  So just kind of take a look at
18    all of that.  So I won't be ruling on it right now.  Okay.

19    Now so just for our clerk's benefit, Ms. Geiger, so that
20    the motion to allow remote testimony is deferred or I guess
21    withdrawn without prejudice to renoticing.

22    Ms. Vartain, do you consider your request to revisit the
23    two who had been allowed to testify remotely free-floating from
24    my ruling on the motion to allow others to testify remotely, or
25    is it contingent on the ruling there?

1          **ATTORNEY VARTAIN:**  It's both, Your Honor.  It is

2     free-floating.  I think the Court should relook at it.  I think

3     the circumstances have substantially changed.

4          However, we more made it as a stylistic argument,

5     Your Honor, that the -- it would be an extraordinary result if

6     the Court were to allow the defendant to put on an entire

7     defense case of its own choosing remotely, and that is

8     inconsistent with Rule 26.

9          And so I think it's both that circumstances have changed

10    enough that the remote testimony for the ones we expect to take

11    next week really is not warranted anymore.  The government

12    never thought it was warranted.  So it sort of heightens our

13    objection.

14         And part two is I think it illustrates the point that the

15    Court has deferred for now which is that the other witnesses

16    should not testify remotely.  The other witnesses being Jeff

17    You and Wu Junsheng.

18         **THE COURT:**  Okay.  The government's opposition to the

19    motion to permit remote testimony was filed on the 15th.  And

20    just thinking about that since it was just yesterday, and this

21    particular motion, I won't require you to file it again, in

22    other words, to file it freestanding, I'll consider it as not

23    wholly contingent.

24         Mr. DiCanio, if you want to file a written objection to

25    that, you can.  Otherwise, I will take this up -- well, I can't

1    really take it up at the first day of the trial.  I think we're

2    in a box.  If we're going to start on Monday, I would have to

3    give a ruling on it, and I'm not prepared to make the ruling

4    specifically today.

5        I'm inclined to deny the request to retract the approval

6    for those two witnesses.  But it may be that the government

7    would have to make the showing that they're really better.  And

8    of course they can't really do that at this point because they

9    don't have the wherewithal to make that inquiry specifically of

10   those witnesses.  How they would find that out or not, I'm not

11   sure.

12       But they do know that COVID and whatever it's morphed into

13   is at whatever state it is which is at not quite the level of

14   panic incorporated into a pandemic as perhaps today people are

15   a little more sanguine about the whole idea.  But I am not

16   satisfied that I can make the judgment call for those

17   witnesses.

18       So maybe I would just say on the record we have I'm not

19   prepared to retract.  And then if you want to add anything,

20   though, to make it a stronger record, you're welcome to,

21   Mr. DiCanio.

22       If there's any way that you feel that, Ms. Vartain, that

23   there's a way for you to find out more about their condition,

24   I'm happy to defer until that point as well.  But I don't feel

25   comfortable changing.

1    My rulings were based primarily on their health conditions

2    and the pandemic at the time and the fear of frankly death if

3    you contracted COVID.  There's less showing that anyone feels

4    that it's likely that somebody's going to die.  But I really

5    don't have the mechanics of what their particular issues are in

6    mind.

7    If we were starting all over right now, would I rule the

8    same way I did before?  I'm not sure, you know.  But I'll

9    just -- we have to have some kind of schedule here.

10   So at this point I think the one asking me to reconsider

11   should make the showing.  And so -- but on the other idea of no

12   matter what, if we're going to start looking at everybody

13   coming in remotely, then that's a separate argument and we'll

14   get back to all that.

15   So you may want to gear up for this no matter what we do,

16   Mr. DiCanio, in that regard.

17        **ATTORNEY DiCANIO:**  Thank you.

18        **THE COURT:**  Okay.  There are other issues.  I do want

19   to -- well, I was going to help Ms. Geiger with this.

20   So the remote motion, then that is withdrawn without

21   prejudice to refiling.

22   The motion -- where were we?  The motion to allow the

23   defense expert to testify was granted.  So -- or is -- oh, I'm

24   sorry, it came from the government to exclude.  I'm sorry.  So

25   renewed motion.  And I will -- the defense thinks I actually

1    said she could testify.  We're just waiting to see if anything

2    bad was brought up before I let her do it in front of the jury,

3    and the government was thinking, no, she couldn't do it unless

4    the proper showing was made of relevance at the time she was

5    offered.  And, of course, we didn't have a jury now.

6         So either way, that motion then coming from the government

7    is denied.  Okay.

8         Now, let's look at what else we had.  I brought up what

9    about this extraterritoriality concept.  And I have to tell you

10   that I don't know that anybody's ever given me kind of a

11   timeline here.  So I've ended up getting one prepared.

12        And it turns out that the CASPA conference or event,

13   whatever you want to call that, did occur farther down the

14   timeline than I had originally thought.

15        So my initial concern about whether that might be

16   something that one could focus on for purposes of an act in

17   furtherance was, given where I thought it was in the string of

18   things here, almost something where the government would have

19   to show that Jinhua and UMC got together from the get-go and

20   were in cahoots.

21        And they may be able to show that, they may not be able to

22   show it.  And if they couldn't show it, then they were prepared

23   to show, based on other events that occurred after these two

24   companies got together, that Steven Chen knew what was going on

25   even if he didn't orchestrate it originally, et cetera, but

1    that this may have come before.

2    No, it really comes pretty much in the heart of the

3    events.  A lot had happened by the time.  So it is taking on

4    less independent importance, but it's still important.

5    And some of the issues that have been raised in connection

6    with it are pretty interesting.  And all of you have submitted

7    authority going in various directions and by inference and

8    analogy and whatever, make your particular points.

9    One of the questions is, is it an element.  And even if it

10    isn't, would it have to be proved beyond a reasonable doubt or

11    by a lesser standard.

12    The government taking the position, oh, it's for the Court

13    to decide, kind of like venue, and that will be by

14    preponderance.  And the defendants, no, it's either an element

15    or it's element-like and therefore would need to be proved

16    beyond a reasonable doubt.

17    I'm kind of leaning toward the latter, but I'm not

18    prepared to make a formal finding on it right now.  And I don't

19    know that any of you were really planning on arguing it.

20    Though if we have time, I'm perfectly happy to hear you on it.

21    It's a very important fact that really goes to whether

22    there's any crime recognized here in the U.S. as opposed to,

23    yeah, it's recognized here but maybe not in Reno.  It ought to

24    be in San Francisco or whatever.

25    So I think that it's pretty important.  It is not in the

1    statute itself.  There may be reasons for that.  And we can

2    talk about it, why it might have been more convenient or easier

3    to have a kind of group single statute.

4        I haven't had a chance to really check when the various

5    statutes were enacted in terms of whether you'd have to go back

6    and amend each one or whether it would be just easier to just

7    make one long new one and say, oh, well, let's just make it

8    clear we're willing to do this under the circumstances and have

9    people charged here if one of these two factors is met, either

10   U.S. citizen involved or act in furtherance being committed

11   here.  So but I am certainly happy to hear about it.

12       You know, in any given case, there may be facts that are

13   not elements per se because the elements are really the final

14   ultimate facts.  But there may be facts that if a jury doesn't

15   find them beyond a reasonable doubt, they can't really find the

16   ultimate fact beyond a reasonable doubt because those facts are

17   so important to the case that, as a practical matter, they

18   aren't just something they can kind of throw into a pod and

19   say, okay, you just lump all this stuff together and therefore

20   the defendant committed the murder.  Okay.

21       There may be just some fact that's just absolutely

22   critical, whether it's DNA, whether it's something else that,

23   without it, the case just doesn't make it, and then if they

24   don't find that as being proved by the highest standard,

25   they're not going to find guilt.

1    So we may have a kind of a situation like that.  Or we may

2    have a real element.  Or maybe it's something else.  So I'm

3    certainly happy to talk about that.

4    I will say that it comes at a point that's a little less

5    critical than I originally thought because you may remember I

6    said, gee, if this wasn't something that was in the furtherance

7    arguably way back when, why do we hear about everything later.

8    And it's not that it was a way back when.  It was really kind

9    of in the middle.

10    And I don't think that I was really fully convinced by the

11    defendant's argument that, well, everything's over, they

12    created the stuff.  If they did it illegally, it's all over.

13    I think the plan was that they were going to -- that

14    Jinhua was going to get this stuff and start making it or

15    making a product using it, the issue being whether they had any

16    reason to know that somebody had done something nefarious in

17    getting it to that point.

18    So, okay.  But that's just kind of simplifying things

19    perhaps beyond what's fair to do, but I just wanted to kind of

20    throw that out there.

21    I also wanted to comment about the instruction binder.  I

22    guess just out of habit, because it's not that often that you

23    have a court trial, and thank goodness I don't, that it seemed

24    like the way you could best put forth your arguments on certain

25    legal issues was to do it by way of proposed instructions.

1    That caused me then to start trying to compare them.  And

2    then sometimes you did, and particularly later when you got

3    wordier, you sort of told me more about where your disputes do

4    lie.  And some of these overlap considerably with some of the

5    briefing on the legal issues that are separately briefed like

6    extraterritoriality.

7    The other question is who's responsible for what somebody

8    else does.  And one of the issues that's come up from going

9    over these instructions, and what I'm going to sort of tell

10    myself about what the law is, is this idea of knowledge of an

11    employee.

12    So let's say that Mr. Ho, you have this whole employment

13    contract idea, and then is he essentially working for Jinhua

14    while stealing stuff.  Okay.  That's one.

15    Separate and distinct from that is the participation, if

16    he did participate in this scheme, of Mr. Chen who I think

17    beyond dispute became an officer of Jinhua.  There may be some

18    issue as to when exactly that happened, but in either case

19    there remains an issue, a legal one, about the responsibility

20    of Jinhua from what Mr. Chen arguably knows.  Okay.

21    The government's position is he must have known even if he

22    wasn't in it at the get-go.  And their argument is he was in it

23    from the beginning, he orchestrated this, he was in charge of

24    all manner of things.  And, gee, even if he wasn't, these

25    people just kind of unilaterally decided to enhance their

individual portfolios by stealing stuff that he had to know

from his experience they couldn't put all this together that

quickly if they did it legitimately.

All right.  So let's just take as a hypothetical for the

moment, because otherwise none of this is relevant, that the

government has shown, just for our purposes, that Mr. Chen knew

that the DRAM was produced using trade secrets.  In other

words, what was turned over to Jinhua was done with trade

secrets that are still in there or not.  We can talk about that

too.

All right.  So the question is let's say he knows, just

for hypothetical.  I'm not trying to scare the defendant with

this.  But it's just not worth talking about it if he's

blameless.  Then it's, yeah, so what, he didn't transfer any

knowledge.

But let's say he has -- yeah, he's not blameless just for

our discussion, and that he knows that this is not really a

legitimate product to be turning over.

Does that knowledge get imputed criminally to Jinhua on an

essentially respondeat superior idea?  Civilly I think it

probably does, from what I can read.

I just had a case in fact, it was not a criminal case,

however, so I say in which someone who worked for company A --

and this is very typical -- you work for company A, is hired by

company B, brings with him, you know, secret sauce or whatever

1    you want to call it from company A, uses it to make a company B

2    product.  Company B gets nailed with a judgment.

3        Okay.  So civilly it's probably go somewhere.  Criminally

4    the defendant is arguing, gee, good faith.  There are all kinds

5    of times when something bad may have happened and yet you had

6    the good faith purchaser, or whatever, and they get to

7    essentially benefit even though something fraudulent or bad has

8    happened.

9        So where that fits into the criminal law, you have a high

10   ranking, high-level guy.  We don't have so much a question of

11   whether you're responsible for somebody way, way down the

12   chain.

13       And then there's a question of, well, he didn't find the

14   stuff out arguably when he was working for Jinhua but when he

15   was working only from UMC.  Again, this is a fact dispute, but

16   again it's not a legal issue if there weren't facts in dispute

17   on this.

18       So if that were the case, if one were to find that, okay,

19   he found out about it, and then he came over with that

20   knowledge to Jinhua and is he kind of like this Trojan horse

21   that brings it over and even if they didn't know, where does

22   that go.

23       So that's become another issue that you've cited case law

24   on with one of you quoting the Supreme Court and Ninth Circuit,

25   the other is quoting the restatement.

1          Anyway, so I think that's a very important one also.  I

2    don't know if I'm ready to really hear all of your full-blown

3    arguments on it because I'm already thinking about it because

4    of everything you've written so far.

5          And it's really problematic again like, you know, bring

6    back the jury so I don't have to deal with all this stuff.

7    And, anyway, so I don't know.  I just wanted to raise that I

8    did find that to be particularly thought-provoking.

9          If I flip quickly through some of the instructions, just

10   to let you know, you know, when I went through them, like the

11   differential here on the first one is the fourth item that the

12   defendant wants to add.  And that's for the second instruction

13   too that the government has to prove that one or more acts in

14   furtherance of the offense were committed in the U.S.

15         And that comes up as I think the distinguishing feature in

16   those first two -- wait, no, maybe not the first two.  The

17   first one -- the government has a number of kind of, I'll just

18   call it definitional things they wanted to add in the second

19   one that the defendant didn't feel and -- was necessary and

20   they threw the fourth one in again from their standpoint.

21         Some of these things are less critical because there isn't

22   a jury.  So you don't have to worry as much about is somebody

23   going to think something that isn't really right and let's

24   clear it up for them.

25         So it's not really an instruction, but it's fine to argue

1    these things.  And if you do have a fight over what something

2    is defined as, certainly I do want to hear that.

3         Oh, yes, then the third one.  Let's see.

4         Well, the defendant is just saying the government can't

5    show that Jinhua knew anything and so the whole idea of having

6    instruction on knowledge is irrelevant.

7         And that's really not a good kind of objection to an

8    instruction.  Because the idea for an instruction is if there

9    is evidence to support a finding, is this instruction, in other

10   words, what we're going to tell the jury, adequate.  Not you

11   shouldn't give it at all because you don't have any evidence.

12        That's like -- that's kind of a secondary argument where

13   one can say, look, we don't think you have it, but heaven

14   forbid, if you're going to instruct, don't do it this way, do

15   it that way.  But anyway so I think again we don't have a jury

16   anyway.

17        All right.  And then you have this whole idea about

18   economic espionage, and the defendant thinks that again as an

19   element for all of these offenses that you need to prove beyond

20   a reasonable doubt there was an act in furtherance.  So, okay.

21        When we get to knowingly, that's an interesting one

22   because I don't know if you're just really making an argument

23   over semantics here.  I don't think anybody thinks to be guilty

24   of these crimes, you have to have read the statute and know

25   what it says.  But you do have to know whatever the underlying

1   facts are that make you a knowing participant in the crime.

2       And so when the government says, okay, we want to tell the

3   jury the government doesn't have to prove that the defendant

4   knew its acts or omissions were unlawful.  So defense says,

5   well, you have to prove that they know it was stolen.  And so

6   that's a law.

7       And I think most people know that it's against the law to

8   steal, and I think that you know what "to steal" means.  But if

9   anybody wanted to rewrite it, you would just say you have to

10  knowingly show that they -- that this, whatever, was taken from

11  the rightful owner without their permission, or whatever the

12  definition is that you want to use for "steal."

13      So I didn't think that was a real dispute because we don't

14  have a real jury.

15      Okay.  Then so let's see.  Was that 5 that I was on?  And

16  now I'm on 6.

17      Then we get to the scope of their authority.  And the

18  defendant -- the government just wanted to say the typical

19  legal definition of agent, and then the defendant wanted to add

20  scope of authority.

21      Now interestingly, if you had a real jury here, you first

22  had to include in some starting instruction that somebody has

23  to be acting in the scope of their authority, and then you can

24  say what it means.  In other words, there's no sense defining a

25  term that the Court has never used.

1       So if everybody agrees you have to be acting in the scope

2   of your authority, then the government says, okay, what you

3   want to say is not totally bad.  But then the rest of it, once

4   you get through this idea of what scope of authority means, is

5   just all wrong.  And, again, we can talk about that in one way

6   or another because, again, nobody is going to be stuck with

7   these exact words.

8       Whatever findings of fact and conclusions of law I come up

9   with here, I can let you know what those are to the extent I'm

10  not required to, and then I don't have to get hung up on one

11  word or another because I'm going to have to determine what

12  that law is or decide that it doesn't matter for some reason.

13      Okay.  The government is concerned that somebody might

14  read scope of employment too narrowly.  Again, I'm aware that

15  it can be quite broader than what the employer authorizes.  It

16  could even go very much contra to what an employer authorizes.

17      But if it is done in the course of what they have

18  authorized you to do, it's ordinarily in the scope.  Because

19  the argument is usually you're going after the employer who may

20  not themselves have participated.  Otherwise you don't have to

21  really worry about agency if you can show the employer really

22  did something wrong individually.

23      So, okay.

24      And then the government thought the last part of what the

25  defendant wanted to add was overstating because it sounded like

1    you had to have a document to create an agency.  And I know you

2    don't have to have a document.  So you don't have to worry

3    about that.

4         Okay.  Now I'm going to number 7.  So the United States

5    has a very long instruction that they say incorporates

6    essentially four contentions about agency and who's liable for

7    what, and that they're concerned the defendant thinks that it

8    has to be totally, totally a sacrifice on behalf of the

9    employer and that the agent is just selfless, that they're only

10   doing this.

11        No.  I don't think the defendant thinks that totally, but

12   if they do, I don't think that's the law.  Most agents are

13   acting partly in their own behalf and then also for the

14   employer.  And it's often all for one and one for all, and how

15   are you going to separate those out.

16        And so if you do something unlawful and that enhances

17   your -- it's all of RICO frankly.  It works out that way where

18   essentially let's say you're shooting victim A so that you gain

19   stature in the group.  And now victim A can't compete in the

20   drug world.  And so that helps your gang.  And, you know, you

21   can't be drawing little individual lines here like that.  So...

22        All right.  But I think that's not really -- as I say,

23   nobody's getting instructed.  So I'm glad it helped you guys,

24   but I just sort of parse through some of this to see if it

25   really mattered.

1    Oh, yes.  Now here you get the good faith idea.  All

2  right.  Do we have a situation where if the defendant were to

3  argue persuasively that Jinhua made up of its initial Jinhua

4  people, unless you want to say Mr. Chen is part of the initial

5  Jinhua, but if you take him out of the equation, you say, look,

6  nobody else there can you show really had any idea that this

7  was going on.  They just thought they hired somebody to do a

8  job that they could do.  They didn't know they were going to

9  have to go out and steal something to do it.

10    And that's been their position from the get-go.  Long

11  before even Mr. DiCanio, Mr. Sloan, Ms. Reitmeier came in the

12  case, they -- that was their position.

13    And the government at a certain point is saying, well,

14  even if, even if, you brought this guy on, you're stuck with

15  him.  And that's this good faith idea.  And we've talked about

16  where that is going to come in.  I know where it comes in.  I'm

17  just not sure how it comes out.

18    So but I will have to make a call on it if I get to the

19  point where I make certain findings.  If I make other findings,

20  I don't have to get to it.  If I find that either the

21  government has a very strong case, I don't have to get to it.

22  If I find the government has not a case, then I don't have to

23  get to it.  It's that middle ground that it comes up in.

24    Okay.  Let's see.  Oh, yes, there was the whole question

25  of let's say you're an independent contractor, an employee, can

1    you still be an agent?  Yeah, probably if you meet the agency

2    definition independent of whatever your title is.  And that

3    goes back a little bit to what you call people, et cetera.

4        It's true most employees will be considered agents but

5    might not be.  Most independent contractors probably aren't

6    agents but could be.  So it may not be just an all or nothing

7    concept.

8        But again, looking at the facts, what's really going on

9    here, if you look at what their relationship is, match it up to

10   a definition of agency, does it work, whatever you call the

11   people.

12       Okay.  All right.  So then let's see.  There were really

13   long arguments here so that's one that I sort of actually

14   flagged where the defendant came in on it because it was more

15   than just flipping a couple of pages.

16       The defendant brings up -- and this would be an issue of

17   what someone's role is, if they are an agent for certain

18   purposes, and if they commit a wrongdoing outside of those

19   bounds of what they were hired to do.  So then the defendant's

20   position is that that would not be attributable because it's

21   outside of their agency.

22       And assuming that is correct that somebody did act beyond,

23   not just we told you not to do it and you did it idea, because

24   there's a case right on that.  Most of these are civil, most of

25   them aren't criminal.

1    But somebody in the context of a union beef was told by

2    the union don't do X or Y, and he was an employee and he did it

3    anyway.  But he did it in the course of what he was supposed to

4    be doing.  And they said okay, you're stuck with it, you know,

5    have better control of your employees.

6        So the argument the defendant is making is, all right, we

7    brought this guy on, Chen, to help us with hiring.  He's the

8    expert in hiring.  We didn't know from anything.  As you know,

9    we weren't doing any of this stuff.  That's why we had to hire

10   somebody from another country.

11       So they come up with this argument and they say all right,

12   he's a hiring guy.  Whatever he did wrong wasn't in the course

13   of hiring.  You can't show that.  All you can show is that once

14   he saw all these hirelings were doing better than you could

15   expect, he had to know this was all bad.  And besides he was on

16   this or that committee where they discussed all these things

17   that he would figure it out from.

18       Okay.  So maybe.  It's an issue again.  Just one more in

19   the many.

20       So now we're up to 8, I think, and that's maybe where

21   we're arguing about the timing of the knowledge.  Let's see.

22   Hang on.

23       Well, they start with, okay, don't give this instruction

24   at all.  You don't have any evidence.  That was their opening

25   salvo.

1    And then they said, and besides it's all been briefed much

2    better in our Rule 29 briefing so go look at that.

3    And then they got to the point of when did you find out

4    whatever you knew.  Did you find out while you were working for

5    our people or when you were somebody else's agent, and

6    therefore we can't be stuck with that.  Which overlaps with

7    good faith and other things.  And they're not big on the

8    restatement.  Okay.

9    I didn't read what Jeff White said yet, but I think that

10   was a case they cited for the proposition that someone said I

11   don't have to follow it.

12   This reminded me, by the way, of an experience I had in

13   state court.  I know this is going on for a long time, but this

14   way I can just tell you that I did read all this stuff.

15   Anyway in state court, the guru, for purposes of a legal

16   digest, was Bernard Witkin.  And everybody cited Witkin for

17   everything.  And so in one instance Mr. Witkin had made a

18   pronouncement as to the law.  And I don't even remember what it

19   was, but it was an issue in a case.  And he just said it.  He

20   didn't have any authority for it or anything.  He just said it.

21   Essentially Witkin on Witkin.  All right.

22   So then a court of appeal, California Court of Appeal case

23   comes out on the issue, and they make a finding and they cite

24   Witkin.  Okay.  Then Witkin comes back in his update

25   supplement, and he cites the case for the proposition that he

1    essentially created.  Okay.

2         So, well, when I saw this in Brickley and whatever and the

3    restatement and everybody, it just brought it back to mind.

4    There are some things that stay with you.

5         Okay.  All right.  So then we have 9.  All right.  This is

6    the government saying joint venture is just essentially a

7    partnership on a limited basis.  And so just like a regular

8    partnership so we'll apply partnership law that if one partner

9    acts badly, everybody's stuck with it.  Find better partners.

10        So the defendant says, well, a joint venture is only

11   criminally liable if they knew about the co-venturer's criminal

12   conduct.  I haven't had a chance to check all that out yet to

13   see whether there's some special rule for joint venturers

14   versus partnerships.

15        Let's see.  One second.

16        Oh, defendant also is going off on this idea that if you

17   folks are relying on a joint venture, that there really isn't

18   one, that it was just an idea that was battered around and not

19   put into effect.

20        And then their position is, and of course the government

21   doesn't agree with this, even if somebody calls something later

22   a joint venture, it's not necessarily a joint venture.  They

23   may just not know the law.

24        Okay.  Then the last one that I've got is 10, and that's a

25   defendant's proposed instruction on good faith.  And the

1    government says no, no, you don't need to have this come into

2    play at all, it's not part of the case.

3         So I've indicated, I realize these are major issues that

4    have to be resolved by me.  And even if we had a jury, they

5    would have to be resolved by me.  So it's not like it's a

6    burden only because of that, by any means.  It's just hard.  I

7    mean, because there isn't a lot of criminal law on it, and

8    there are some distinctions in the sense of the criminal law

9    versus the civil.

10        I was trying to think.  I think that one of the arguments

11   that defendant was making is analogizing punitive damages as

12   quasi criminal, whatever law there is, then it should be even

13   stricter for real criminal.  And that had to do with what level

14   of employee's acts can be attributable to the entity defendant,

15   to corporate defendant.  For punitive damages, it's officer,

16   director, or managing agent.

17        Interestingly, director, which is one of the things that

18   the defendant wants to argue they're not responsible for

19   because they say the response that directors aren't agents.

20   Okay.

21        He had the catch phrase definitely for punitive damages,

22   which they want to argue at a minimum, are to control how low

23   you can go and still on the organizational chart and hold an

24   employer responsible.  And they throw in director.  They think

25   director can definitely be an agent of some sort that you're

1    stuck with.  So -- or maybe they're not thinking agency law.

2    I'm not sure what they're doing there.

3        But anyway that's the stock phrase used in every punitive

4    damage instruction.  And it gets brought into -- that's in

5    CACI.  It's also, though, technically I think used often in

6    federal court as well.

7        So, yes.  Where do you want to go from here?  Home?  I

8    don't know.

9        **ATTORNEY SLOAN:**  Your Honor, on the defendant's side,

10   I'm addressing the extraterritoriality issue as well as most of

11   the jury instructions, although Ms. Reitmeier has some of

12   those.

13       And I know you've hit on a lot of different issues.

14   You've obviously thought a lot about this.  I'd like to go to

15   where you think I could be most helpful if there's anything in

16   particular.

17       There are two that I thought were maybe pertinent that I

18   would address.  I don't think we need to address all of them at

19   this time, but certainly happy to add my thoughts and positions

20   on any in particular.  But I had two in mind that I thought

21   might be.

22       **THE COURT:**  Okay.  And I'll let you hit on those and

23   give the government a chance to just say a few words too so you

24   don't feel -- anybody feels like they didn't get to take an

25   opportunity they're given.

1          But I want to say that I'm assuming with all the talent

2     that's been brought to bear on these various issues that you

3     have plumbed the depths of whatever authority is out there on

4     both sides in an effort to try to say what the law is in --

5     under circumstances that don't routinely come up.

6          And I have not -- I'll just tell you I haven't had a

7     chance to read everything that you've cited because in making

8     that effort, you have, on both sides, come up with quite a bit.

9     And at some point I'm going to have to make just a judgment

10    call on what I think because I don't want to hide from you

11    however I come out.

12         And that's assuming I do have to make a determination on

13    these issues.  And I haven't even heard the whole case.  In

14    fact the majority of the defendant's defense is still out there

15    waiting to be put in.

16         So I want to give me a chance.  I can't -- I've just told

17    you the ones I think are really important.  The timing of

18    the -- I'm mostly concerned how these issues come into play

19    with respect to guilt based on the actions and knowledge --

20    I'll tell you asserted actions and knowledges of Stephen Chen.

21    Mr. Ho, I think, is a different set of concepts there

22    primarily.

23         So turning to Mr. Chen, there's the -- there are issues

24    about when he knew whatever he assertedly knew and whether or

25    not, if that all predates his coming aboard at Jinhua, they're

1    stuck with it nonetheless.

2        There's the issue -- and that, I think, wraps in the good

3    faith thing too.  Though perhaps there are separate issues that

4    if you wanted to say, okay, he found it out while he was there,

5    but nobody else knew about it.  And I don't know what you would

6    say at that point.  That gets a lot harder.

7        Okay.  So I just, you know, as I say, I think that timing

8    of the knowledge.  And some of these other things are more

9    factual than legal.  I don't think they're real legal disputes.

10        So the timing of his knowledge.  Whether

11   extraterritoriality is a fact that has to be proved beyond a

12   reasonable doubt.  And if so, then it's a jury issue rather

13   than some kind of preliminary court issue.

14        But since I am the jury, in effect, I don't know, I don't

15   think it probably makes any difference.  The real question is

16   the standard of proof, okay, on that.  So I think that's very

17   important.

18        We have someone -- I'm trying to remember who said it.  It

19   was a district court who called -- I think called

20   extraterritoriality comparable to an element.  Okay.  And I

21   forgot who that was.  It wasn't Loretta Preska, was it, out of

22   New York?  Anyway, I just don't remember.

23        Anyway, but so all right.  Those are two really key

24   important things.  If you wanted to talk about those two

25   anymore, I mean, if you don't have anything more, I'll just

1    have to go over everything that all of you, you know, have

2    given me.  But I don't know.

3        I mean, there may be some way that you can synthesize

4    something to say what it means more than just what's out there.

5        **ATTORNEY SLOAN:**  Yes.  Your Honor, let me address

6    first the extraterritoriality issue.  So that I think the first

7    point is whether or not it's an element that has to be proved

8    beyond a reasonable doubt.

9        And I think that the law, and I would refer mostly to *In*

10   *re Winship* as well as *Apprendi* and the other *Apprendi* decision

11   from the Supreme Court.

12       But I think the key point here is, Your Honor, the crime,

13   and this is where I think there's a clear difference between us

14   and the government, the crime as created by the Congress, the

15   Congress basically said that, you know, conspiracy or economic

16   espionage or theft of a trade secret that occurs in the United

17   States is a crime.  If it occurs outside -- if the offense

18   occurs outside the United States, it is only a crime that is

19   punishable that is, you know, recognized as a crime under 1831

20   or 1832 in two circumstances:  One, if the defendant is a U.S.

21   citizen; or two, if there's an act in furtherance.

22       Now that is true.  It's in a separate section of the same

23   chapter.  It's in 1837.  But 1837, that extraterritoriality

24   provision, applies to every section in that chapter, 1831 and

25   1832.  And then there's one or two civil elements of trade

1    secret theft.  I think it's 1836.  But it applies to all of

2    them.

3        And I would argue, Your Honor, that Congress simply put

4    that in as a -- the simplest and most efficient way to do it is

5    to say that for all of these offenses within this chapter,

6    whether they be criminal, 1831 and 1832, or civil, that there's

7    not an offense, there's not a violation of U.S. law if it

8    occurs outside the United States except in these circumstances,

9    when there's a U.S. citizen or when there's an act in

10   furtherance.

11       And because of that, that's an essential fact necessary to

12   prove the crime itself, and therefore that is an element of the

13   offense.

14       **THE COURT:**  Okay.  Did you have a second one you

15   wanted to do?  Or do you want to just stick with that one --

16       **ATTORNEY SLOAN:**  Well, let me -- just sort of a

17   related issue which is something that you focused on in

18   particular was that you noted that the CASPA conference and the

19   meeting with KLA occurred later in the process than you

20   remembered.  And you're correct that it is in October of 2016.

21       But the reason that that's not in furtherance of the

22   alleged crime is because what the government has alleged and,

23   you know, I read the Indictment again last night, is -- and,

24   you know, I'll refer you to the language in Count One on page 8

25   if you have it before you.  And this is the same --

1      **THE COURT:**  I do, but you have to give me one minute

2   just to turn to that page.  Okay, I do have it in hand.  I have

3   it.

4      **ATTORNEY SLOAN:**  Yeah.  So, right.  So they notice the

5   potential sort of objects of the conspiracy or the different

6   subsections, in this case of 1831 of economic espionage.  And

7   it's knowingly steal or without authorization carry away,

8   knowingly or without authorization copy or duplicate, or

9   receive -- knowingly receive, buy, and possess trade secrets.

10     And if you look at the substantive count, which is Count

11  Seven, it only refers to that last clause, which is

12  knowingly -- knowingly receiving, buying, or possessing trade

13  secrets.

14     **THE COURT:**  Okay.

15     **ATTORNEY SLOAN:**  So the point here is that the

16  allegation, what this whole case is about, the way the

17  government has charged it, it's all about a conspiracy or a

18  substantive events for a Chinese state-owned enterprise which

19  they claim is appointed instrumentality Jinhua to obtain these

20  documents.

21     There is nothing in the Indictment about anything about

22  Jinhua using whatever technology they obtain in order to

23  manufacture it in China.  There's nothing in the Indictment.

24  In fact there's nothing charged in the Indictment.  There's no

25  overt act after February of 2017.  And as we know, the

1  technology transfer actually doesn't take place until

2  February -- until September of 2018.

3       The government is basically trying to constructively amend

4  the Indictment.  And in their moving papers and in their

5  opposition, they shift and say, oh, what this is really about

6  is about the Jinhua sort of perfecting and manufacturing this

7  technology in China.

8       But that's not what they've charged in the Indictment.

9  What they've charged is the possession, obtaining that -- the

10  DRAM alleged trade secrets.

11       And there's nothing that happened in -- at the CASPA

12  conference or in the meetings with KLA that further that in any

13  sense.  Because according to the government's own FBI agent,

14  what happened at the CASPA conference was that you had Jinhua

15  coming and they were talking to prospective employees, and they

16  were talking about, you know, aspirationally bringing them

17  there when they open a fab which, according to the agent's

18  testimony, I think, was going to be in 2020.

19       But regardless of the timing, the reason they went both

20  with respect to the CASPA conference and meeting with the KLA

21  officials, was in order to obtain tools and potentially

22  aspirationally sort of whet the interest of employees or

23  engineers in the United States, but for the purpose of

24  manufacturing this product at a fabrication plant in China.

25       That's not the crime alleged.  And the government is

1    trying to pivot now because they realize that's not what

2    they've charged.  And in order to allow them to pivot would

3    effectively be a constructive amendment of the Indictment.

4        And I'd also posit, Your Honor, that there's no evidence

5    in the record at the close of the government's case that would

6    support, you know, any evidence that that was the intent or

7    purpose of this crime in order to perfect the technology and

8    manufacture it in China.

9        So that's why, although the CASPA conference and the

10   meeting with KLA occur in October 2016, a little later than you

11   had originally thought, it's not in furtherance.  It's not in

12   furtherance of the charged offense which is the possession,

13   obtaining the documents.  It's not -- they didn't charge that,

14   you know, that it was for the purpose of Jinhua manufacturing

15   this DRAM technology in China.

16       **THE COURT:**  So for purposes of Jinhua, as opposed to

17   UMC, what is your position as to when this conspiracy was over?

18   Are you saying for UMC it was over the day that Ho and whoever

19   else walked out with the stuff from their job at Micron, and so

20   that's it.  So whenever they walked out, that's the end of it,

21   that they did what they did, they possessed it, that it

22   couldn't continue on for the time they were using it if they

23   were at UMC?  Do you have some point where it's all over?

24       **ATTORNEY SLOAN:**  Well, Your Honor, frankly one of the

25   problems we've had is that it's unclear.  We don't even know

1   when the government's claiming Jinhua possessed the material.

2   I don't know whether they're claiming we possessed it when

3   J.T. Ho came over to UMC or when it got transferred to Jinhua

4   in September of 2018 or some time in between.

5       We don't even know that, Your Honor.  And that's one of

6   the things that we've asked the government to sort of explain

7   to us, and they never have.  As you recall, that's one of the

8   points of the motion for bill of particulars.

9       But in terms of one of conspiracy --

10          **THE COURT:**  Well, that is years ago.

11          **ATTORNEY SLOAN:**  Yes.

12          **THE COURT:**  Years ago and denied at the time because

13   the government was not in a position to really add to anything

14   to the Indictment at the time.

15      All right.  But I want to go back for a minute.  If you're

16   just saying I don't know, fine.  But then it's hard to make the

17   argument, unless you just want to challenge the Indictment, and

18   I think we're past challenging the in -- by the way, I think

19   we're past challenging the Indictment for purposes of making

20   the argument on extraterritoriality.

21      Okay.  To the extent that there was an argument that that

22   had to be in the Indictment, whether it had to be or not,

23   frankly on your position it's an element and the element goes

24   to whether you've pled a crime or not, that has to be raised

25   before you go to trial, not this late in the game.

1       So it may not be a waiver, but whatever it is, you can't

2   do it now.

3       So I want to go back because there's no end in the

4   Indictment to the end of the conspiracy essentially.  It says,

5   well, we know when it started, we don't know when it ended but

6   sometime.

7       I thought this issue may have been raised partly before

8   when the government was wanting to put in certain evidence

9   concerning the receipt of the trade secrets, and at that time

10  that Jinhua had argued, wait a minute, that's beyond the scope

11  of the Indictment conspiracy cutoff.

12      And if it came in, unless I was wrong then, it's in as

13  part of the conspiracy.  But if you just want to take the word

14  "buy," and the government, if they want to say, okay, you

15  bought it when you took it or you bought it earlier, but at a

16  minimum you bought it when you took it and you knew that it was

17  hot stuff because of Mr. Chen who was already working for you

18  and, et cetera, then it's really in the middle instead of the

19  end.

20      So I don't know.  But I'm at least not leaning toward

21  finding that they've pled themselves out of a crime, but I'm

22  not -- yeah, I'm not absolutely certain in that regard.  And so

23  I want to give whoever is designated to take these two points,

24  if they want to.

25      But you only wanted to do two.  That was the two, right?

1          **ATTORNEY SLOAN:**  Yes, Your Honor.  Can I just say one

2     or two more quick points on that issue.

3          You asked me directly like when the conspiracy ended.

4     And, again, I don't know --

5                          (Simultaneous colloquy.)

6          **THE COURT:**  You said you don't know.  Now you know;

7     right?

8          **ATTORNEY SLOAN:**  Well, no.  It's unclear from the

9     government.  What I would say, and I think it's fair to say --

10                         (Simultaneous colloquy.)

11         **THE COURT:**  -- knowledge.  Okay.  Go ahead.

12         **ATTORNEY SLOAN:**  What I would say is fair to state

13    based on the way it's pled in the Indictment and the way it was

14    proven at trial that at the very latest, the conspiracy ends

15    when the -- there's a transfer of the alleged trade secrets of

16    the alleged -- you know, the DRAM material which they claim

17    contains the trade secrets, which happens in September 2018.

18    At the very latest, that's the end of it.  And what --

19         **THE COURT:**  What transfer is that?  From whom to whom?

20         **ATTORNEY SLOAN:**  That's from UMC to Jinhua.

21         **THE COURT:**  Okay.  You say that -- but didn't they --

22    is that the only transfer they had was in September?

23         **ATTORNEY SLOAN:**  I think they claim that there was an

24    earlier transfer.

25         **THE COURT:**  How about a later one?  How about a later

1   one?  No?

2       **ATTORNEY SLOAN:**  You can ask the government.  I don't

3   think that there's -- there's certainly no allegations of that,

4   and I don't believe there's any evidence of that either.

5       As a matter of fact, right after the transfer, soon after

6   the transfer, the government indicted Jinhua and Jinhua was put

7   on the entities list.  And there was no transfer of, you know,

8   I think anything else after that.

9       There's certainly no allegations of that, to my knowledge.

10  And there's no evidence in the record of that, nor I think will

11  be there any evidence because it didn't happen.

12      So I think at the very latest, the crime, the conspiracy,

13  and the substantive offense is complete when the transfer takes

14  place in September 2018.  And that's the -- again, the

15  possession, when Jinhua allegedly obtained possession of this.

16      The reason that CASPA, again, and KLA are not in

17  furtherance is because that was to talk to potential employees

18  and to talk to tool manufacturers about obtaining tools and

19  potentially employees for the fabrication plants that Jinhua

20  was building in China for the purpose of, you know, allegedly

21  manufacturing this, which is different, substantively different

22  from obtaining possession of the alleged trade secrets.  That's

23  why it's not in furtherance, Your Honor.

24      **THE COURT:**  Okay.  It sounds like you're saying that

25  the missing verb is "use."

1      Okay.  I'm going to turn to whoever is going to speak on

2    behalf of the government.

3        **ATTORNEY MARZEN:**  Your Honor, I'm happy to speak, but

4    I'll be very brief because I realize we have burdened you and

5    peppered you with an enormous amount of paper, and you've had

6    to digest it over a very modest amount of time.

7      So a couple quick points.  One is, yeah, we're beyond

8    quibbling about the Indictment.  So on extraterritoriality,

9    it's not a pleading issue anymore.  That's been forfeited.

10    Ninth Circuit's not a good cause circuit.  There's no good

11    cause alleged.

12      So even elements are waived because, as you say, if you

13    don't plead an element, you haven't pled a crime.  Failures to

14    plead a crime under Criminal Rule 12(b) need to be made before

15    trial.  This one wasn't.

16      So the only issue here is the statutory issue, is there an

17    act in furtherance.  And I think my good colleague at the bar

18    needs to not only read the Indictment but also read the

19    statute.

20      So the statute 1831 and 1832 talks about conspiracies

21    including not just the agreement but also the agreement to do

22    any act to affect an object of the conspiracy.

23      In paragraph 52 of the Indictment, the quote --

24        **THE COURT:**  Wait, wait, wait --

25        **ATTORNEY SLOAN:**  -- the objects of the conspiracy --

1          **THE COURT:**  Wait, wait, wait --

2          **ATTORNEY SLOAN:**  -- were carried out in part as

3  alleged in paragraphs 18 through 34.

4          **THE COURT:**  Wait, wait.

5          **ATTORNEY SLOAN:**  Certainly.

6          **THE COURT:**  I just wanted you to stop for a sec till I

7  got up to it, but I did.  Okay.  Paragraph 52.

8          **ATTORNEY MARZEN:**  My apologies.  And just a footnote

9  as to why we have a challenge here is because the speaker is

10  only from Ms. Vartain, and I have the world's greatest

11  microphone.  And we end up having to switch between the one and

12  the other.  We will have this fixed by Monday, we promise.

13          **THE COURT:**  Okay.  That's great, but I just want you

14  to stop for a second so that I could both read it and hear you

15  at the same time.

16          **ATTORNEY MARZEN:**  Perfect, Your Honor.

17          **THE COURT:**  Okay.

18          **ATTORNEY MARZEN:**  So paragraph 52 says the objects of

19  the conspiracy were carried out as described in paragraphs 18

20  through 19 -- or sorry, 18 through 34.

21          Paragraphs 18 through 34 describe the manners and means of

22  the conspiracy, and it helpfully describes the objects that

23  were carried out.  If you look at paragraph 19, the purpose of

24  the conspiracy, one of the purposes, was mass producing

25  advanced DRAM.  That's paragraph 19, second line.

1      And as you were questioning my colleague, Mr. Matt Sloan,

2   getting skilled workers and equipment, it's hard to think of in

3   an economic espionage conspiracy what could be more in

4   furtherance of the conspiracy than getting the people and kit

5   you need to make the DRAM from trade secrets that were ripped

6   off from Micron.

7      And that's -- I think that's all I have unless one of my

8   good colleagues wants to add anything more.  We'll, of course,

9   address all of these in greater detail at closing.

10      One comment I -- and this is my third comment, I think it

11   was wise that Mr. Sloan did not raise was the due process

12   constitutional argument.  Congress, in 1837, exercised only a

13   portion of its constitutional powers to legislate

14   extraterritoriality.

15      Frankly, if the pleading issue is gone, we either -- we,

16   the government, in this criminal prosecution stand or fall on

17   1837(2).  We either satisfy you that there's sufficient

18   evidence of an act in furtherance of the offense or we don't.

19      If we do, there's no independent constitutional issue.  If

20   we don't, you'd never reach the constitutional issue because we

21   haven't satisfied the statute.

22      **THE COURT:**  Okay.  So your response to Mr. Sloan is

23   that he is only reading a small part of the Indictment and that

24   it's fleshed out in the latter paragraphs; is that it?

25      **ATTORNEY MARZEN:**  Yes, Your Honor.

1          **THE COURT:**  In other words, the whole picture of

2     what -- why Jinhua was involved in it is spelled out, so that

3     they can get the stuff and they can make it and what have you.

4     Okay.

5          Well, all right.  As far as the element idea, you know, I

6     think you've essentially covered that as well by what you said

7     for the moment.  You know, it doesn't have to be fully fleshed

8     out right now.

9          You know, time in your company flies.  By my watch, it's

10    11:57, which means that this court reporter has been reporting

11    for essentially two hours with no break, which I just want to

12    thank her very much at this time.  I totally lost track of that

13    time.  And it's much harder to take down argument like this

14    than it is a witness being questioned where there are lulls

15    while they think about what they're saying, et cetera.

16         So I think we may have covered all that we can do today.

17    Very interesting.  Okay.

18         Ms. Geiger, you are now visible.  Did you want to say

19    anything or you're just popping back in at this point?

20         **THE CLERK:**  Just popping back in.

21         **THE COURT:**  Okay.  Well, then I think we've covered

22    it.  Is everybody in accord that we can recess now?

23         I'm getting nods.

24         **ATTORNEY DiCANIO:**  Your Honor, can I just raise one

25    issue?

1          **THE COURT:**  I don't believe it.  All right.

2          The record will reflect there were three nods of the four

3     lawyers currently visible, and the fourth is Mr. DiCanio

4     raising one finger, all right, his index finger.

5          **ATTORNEY DiCANIO:**  Sorry, Your Honor.

6          **THE COURT:**  It's okay.  Go ahead.

7          **ATTORNEY DiCANIO:**  It's with good intention though.

8          So, Your Honor, one of the things I wanted to ask the

9     Court.  So our first witness is going to be testifying starting

10    at midnight China time.  And based upon the anticipated direct

11    and what I believe the government will do in cross, my guess is

12    that it would take most of the day to finish him.

13         **THE COURT:**  Really?

14         **ATTORNEY DiCANIO:**  What I'm worried about, Your Honor,

15    is if I guess wrong on the government cross-examination, I

16    don't want to be in the situation where the Court looks and

17    says, you know, where is your other witness and it's, you know,

18    4:00 o'clock in the morning China time.  And I wondered if the

19    Court would give us a little bit of grace if, for whatever

20    reason, we stop a little bit early, that I could just let the

21    second witness just sleep and take it up on Tuesday.

22         **THE COURT:**  Any objection to that particular request?

23    I'm seeing heads shaking "no."

24         **ATTORNEY VARTAIN:**  No, Your Honor.

25         **THE COURT:**  All right.

1          **ATTORNEY DiCANIO:**  Thank you.  And thank you to the

2   government for accommodating, Your Honor.

3          **THE COURT:**  All right.  Then I think -- okay, was that

4   it?

5          **ATTORNEY DiCANIO:**  Yes, Your Honor.

6          **THE COURT:**  Okay.

7          **ATTORNEY VARTAIN:**  Your Honor, now I have one quick

8   one.

9      Mr. DiCanio has a habit of learning of things an hour

10  before court appearances, and that keeps us all on our toes and

11  excited to come to court and hear about the latest breaking

12  news.

13     To the extent Mr. DiCanio hears anything in sufficient

14  time to let the government know in advance, we'd appreciate

15  advance notice that predates.  An hour before court on Monday

16  would be terrific.

17         **THE COURT:**  Well, I've already instructed the defense

18  to provide to both the Court and opposing counsel notice of any

19  developments regarding the ability of the two witnesses who

20  have not yet gotten formal approval to appear in person.

21     I will simply add that instruction to anything that

22  appears to be of interest to all parties so that we don't get

23  in a situation where someone then has to ask to continue or

24  extend things in order to deal with something that's very new.

25         I don't really know that Mr. DiCanio has held information

1    back so much as he just keeps getting it at the last minute.

2    So -- but I think that's all I can say on that point.

3        All right.  Now going once, twice, all right, three times.

4    We're in recess.

5            **ALL:**  Thank you, Your Honor.

6            **THE COURT:**  Bye, everybody.  See you soon.

7            **THE CLERK:**  Court is in recess.

8                (Proceedings adjourned at 12:01 p.m.)

9                        ---oOo---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **<u>CERTIFICATE OF REPORTER</u>**

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Saturday, August 19, 2023

8

9

10

11     _____

12          Kelly Shainline, CSR No. 13476, RPR, CRR
                     U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25